IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JAMES NEWTON,

     Plaintiff,

vs.                                                                                    Civ. No. 19-504 KG/KK

ROBERT WILKIE, in his
capacity as SECRETARY OF
VETERANS AFFAIRS,

     Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, a 67-year old African American who suffers from post-traumatic stress disorder (PTSD), is currently employed by the New Mexico VA Healthcare System (NMVAHCS) as a Supply Technician, GS-5.[1]  Plaintiff reported discrimination at the NMVAHCS in 2009, 2013, 2015, and 2016.  In 2017, Plaintiff applied for three positions within the NMVAHCS:  File Clerk/Scanning Specialist, GS-4 (four vacancies); Administrative Support Assistant, GS-5 (one vacancy); and Education Technician, GS-7 (one vacancy).  Defendant did not select Plaintiff for any of those positions.  As a result of that non-selection, Plaintiff filed this lawsuit against Defendant alleging (1) race discrimination under Title VII; (2) age discrimination under the Age Discrimination in Employment Act (ADEA); (3) disability discrimination under the amended Americans with Disabilities Act (ADAA) and the Rehabilitation Act; and (4) retaliation under Title VII.

Defendant filed the instant Motion for Summary Judgment and Supporting Memorandum (Motion for Summary Judgment) on June 29, 2020.  (Doc. 37).  Defendant moves for summary

---

[1] "GS-5" refers to a General Schedule grade of 5, which corresponds to a specific annual salary. *See* (Doc. 37-2).

judgment on all of Plaintiff's claims.  The Motion for Summary Judgment is now fully and timely briefed.  (Docs. 38-40, and 42-44).  The Court notes jurisdiction under the above federal statutes and 28 U.S.C. § 1331 (federal question jurisdiction).  Having considered the Motion for Summary Judgment, the accompanying briefing, the controlling law, and for the following reasons, the Court grants the Motion for Summary Judgment.

As an initial matter, Plaintiff states in his response that he "is no longer pursuing his failure to hire for the education technician position on the basis of discrimination and retaliation."  (Doc. 39) at 10.  Plaintiff also states that he "is no longer pursuing his claim of retaliation for the Administrative Support Assistant position."  *Id.* at 12.  The Court, therefore, will grant summary judgment as to those claims and dismiss them with prejudice.  *See Hinsdale v. City of Liberal, Kan.*, 19 Fed. Appx. 749, 769 (10th Cir. 2001) (affirming district court's decision to grant summary judgment on claim plaintiff abandoned in response to motion for summary judgment); *S.W. v. Geo Grp., Inc.*, 2019 WL 430870, at *5 (D.N.M.) (entering summary judgment on abandoned claims and dismissing those claims with prejudice).

## I.  *Summary of Material Facts Viewed in the Light Most Favorable to Plaintiff*[2]

### A.  *The File Clerk/Scanning Specialist Vacancies*

On January 18, 2017, the Veterans Health Administration issued a job announcement seeking to fill three File Clerk/Scanning Specialist, GS-4, Step 1,[3] vacancies in the NMVAHCS Medical Record Unit.  (Doc. 37) at 5, ¶ 7.  Plaintiff submitted an online application, including a

---

[2] Unless otherwise noted, the summary of material facts is undisputed.  Moreover, the summary of facts pertains only to the remaining claims as they relate to the File Clerk/Scanning Specialist vacancies and the Administrative Support Assistant vacancy.

[3] Each grade contains 10 steps, which refer to incremental salary increases.  *See* (Doc. 37-2).

resume that indicated he is a "Service Connected Disabled Veteran…." *Id.* at ¶ 9; (Doc. 39-1) at 7.

Rebecca Wirth, Supervisory Medical Records Administrator, and Ruben Foster, Supervisory Medical Support Assistant, independently scored the resumes submitted for the File Clerk/Scanning Specialist vacancies. (Doc. 37) at 5, ¶ 10. The resume scores for the top five candidates were as follows: Plaintiff and Edward Mastrovito 50, Valerie Yara and Sandy Burciaga 48, and Michael Trammel 46. *Id.* at 6, ¶¶ 11 and 12.

Wirth and Foster then interviewed the top five candidates for four vacancies[4] using a standard set of interview questions. (Doc. 37-4) at 1, ¶ 6; (Doc. 39-1) at 2. During Plaintiff's interview, Wirth stated that she would check with Plaintiff's supervisor, Nicole Chilson. (Doc. 39-2) at 3, depo. 18. Plaintiff had filed Equal Employment Opportunity (EEO) discrimination complaints against Chilson in the past. *Id.* at 5, depo. at 31. Both Wirth and Foster also "became aware of Plaintiff's race during the interview process." (Doc. 39) at 8, ¶ A.

Wirth and Foster independently scored the interviews and made notes on interview score sheets. (Doc. 37) at 6, ¶ 14; (Doc. 39-1) at 8-9. Plaintiff received an interview score of 30, the lowest interview score. Doc. 37) at 6, ¶ 15. The combined resume and interview scores were as follows: Yara 99, Mastrovito 98, Trammel 95, Bruciaga 92, and Plaintiff 80. *Id.* at *¶ 16.*

Except for Plaintiff's interview score sheets, Defendant did not maintain the interview score sheets for the other top applicants. (Doc. 39-1) at 6, 8-9. Moreover, Defendant did not maintain the applications and resumes of any of the top applicants, including Plaintiff. (Doc. 39-1) at 6; (Doc. 39-3) at 2.

---

[4] A fourth File Clerk/Scanning Specialist vacancy occurred after the issuance of the original File Clerk/Scanning Specialist job announcement. *See* (Doc. 37-4) at 2, ¶ 9. Wirth was authorized to fill that vacancy using the same Candidate Referral List compiled for the original File Clerk/Scanning Specialist job announcement. *Id.*

Wirth referred the top four candidates to Julie Dreike, the Health Administration Service Chief, to fill the four File Clerk/Scanning Specialist vacancies.  (Doc. 37-4) at 2, ¶ 9.  Dreike did not interview the four applicants but filled the vacancies on Wirth's recommendations.  *Id.* at ¶ 11.

Wirth and Foster attested in affidavits that they did not consider Plaintiff's race, age, disability, or prior EEO activity in scoring Plaintiff's resume and interview.  (Doc. 37-4) at 2, ¶ 12; (Doc. 37-5) at 1, ¶ 10.  Furthermore, Wirth and Foster attested that they were unaware of Plaintiff's disability and prior EEO activity at the time of Plaintiff's non-selection.  (Doc. 37-4) at 2, ¶ 13; (Doc. 37-5) at 1, ¶ 12.

When Plaintiff applied for the File Clerk/Scanning Specialist position, Plaintiff was a Supply Technician, GS-5, Step 10, with an annual income of $42,814.00.  (Doc. 37) at 7, ¶ 23. If Defendant had selected Plaintiff to fill any of the File Clerk/Scanning Specialist vacancies, Plaintiff's grade would have been lowered to a GS-4, Step 1, and he would have suffered a $13,381.00 loss in pay.  *Id.* at ¶¶ 24 and 25.  In fact, a person in a File Clerk/Scanning Specialist position could, at most, be promoted to a GS-4, Step 10, and receive an annual salary of $38,258. (Doc. 39-2) at 7, depo. at 43; (Doc. 37-2) at 14.

Plaintiff, nonetheless, applied for the File Clerk/Scanning Specialist position in order to move to a different department in the NMVAHCS.  *Id.* at 7, depo. 44.  As noted above, Plaintiff had filed EEO complaints against his supervisor.  Hence, Plaintiff wanted a "clean start" in a new department where he "could have looked for upward mobility positions…."  *Id.*

### B.  The Administrative Support Assistant Vacancy

On July 7, 2017, the Veterans Health Administration issued a job announcement for an Administrative Support Assistant, GS-5, in the Neurology Service at the NMVAHCS.  (Doc. 37)

at 7, ¶ 26.  The job announcement was open to only current NMVAHCS employees.  (Doc. 42-1)

at 1, ¶ 2.  The job announcement stated that

> the incumbent for this position serves as administrator to the Neurology Service and other
> professional staff, coordinating a wide variety of administrative and clerical tasks
> maintaining the Service. The incumbent serves as the initial point of contact for all
> questions, information and problem resolution in the areas of clinic scheduling and
> changes, travel, human resources, files management, correspondence preparation and
> control, time and attendance, office automation systems, purchasing and procurement.
> Other duties include, among other things, serving as the Service's secretary/office
> receptionist and preparing responses to inquiries on routine matters.

(Doc. 37-7) at 1, ¶ 4.

Plaintiff was the only qualified applicant on the Non-Competitive Candidate Referral List

created for the Administrative Support Assistant job announcement.  (Doc. 37) at 7, ¶ 27; (Doc.

39-1) at 3; (Doc. 42-1) at 1, ¶ 3.  Plaintiff's resume would have included his "service-connected

disability rating."  (Doc. 39) at 8, ¶ C; *see, e.g.,* (Doc. 39-1) at 7.

Dr. Larry Davis, the Acting Chief of the Neurology Service and "the selecting official for

the position," received the Non-Competitive Candidate Referral List with only Plaintiff's name

on it.  *See* (Doc. 37) at 7, ¶ 28.  Dr. Davis, Dr. Molly King, the Assistant Chief of the Neurology

Service, and "other physicians and staff members interviewed Plaintiff as a team." *Id.* at ¶ 29.

During the interview, Dr. Davis asked Plaintiff how long he planned to work since he is "close to

retirement age[.]" (Doc. 39-2) at 4, depo. at 28-29.  Plaintiff responded that he planned to work

three to five years.  *Id.* at depo. 29.  Dr. Davis then commented that Plaintiff was "going to be

like Walter." *Id.*  Walter is an African American, in his seventies, who works at the

NMVAHCS.  *Id.* at 5-6, depo. at 33-34.

After Plaintiff's interview, "[t]he team unanimously agreed that Plaintiff lacked the skills

needed for the position."  (Doc. 37) at 7, ¶ 31.  Indeed, "[n]o one was enthusiastic about

[Plaintiff's] interview performance." (Doc. 37-7) at 1, ¶ 5. From Dr. King's perspective, Plaintiff "lacked the necessary experience for the job." *Id.* Dr. King noted that

> [a] clinical secretary frequently interacts with patients, medical students, residents and staff via phone and in person and must be capable of managing people, expectations, and disruptive behavior at times. In addition, the incumbent needs to keep track of small details and follow through on tasks across multiple disciplines for an entire service of eight (8) providers, a nurse, and technician.

*Id.* Dr. King attested in her affidavit that she "honestly believed that [Plaintiff's] previous work experience and skill set did not match the needs of the Service." *Id.* at 1-2, ¶ 5.

Dr. Davis ultimately decided not to select Plaintiff for the Administrative Support Assistant position because Plaintiff had no experience (1) working as a clinical secretary; (2) "performing the duties described in the announcement;" (3) "answering numerous Neurology Service calls from patients with specific questions;" and (4) "handling lost patients who might wander into [the Neurology Service] area with odd questions, some of whom would be … upset and angry." (Doc. 37-6) at 1-2, ¶ 5. Dr. Davis noted in his affidavit that the clinical secretary would be alone three days a week "to assist individuals needing help." *Id.* at 2, ¶ 5. Dr. Davis further noted Plaintiff "did not know the general aspects of the electronic medical record system," and Dr. Davis "was not sure that [Plaintiff] could electronically retrieve a patient's medical records or understand any of the medical terminology in the records to help the patient." *Id.* Dr. Davis attested that he "honestly believed that [Plaintiff] lacked the necessary experience/skills needed for the position…." *Id.* at ¶ 6.

Dr. Davis further attested that he did not consider Plaintiff's race, age, disability, or prior EEO activity when deciding not to select Plaintiff for the Administrative Support Assistant position. *Id.* at ¶ 7. Also, Dr. Davis attested that he was unaware of Plaintiff's disability and prior EEO activity at the time of Plaintiff's non-selection. *Id.* at ¶ 8.

No notes or score sheets associated with the Administrative Support Assistant interview are available.  (Doc. 39-1) at 3.  In addition, Defendant did not produce Plaintiff's application for the Administrative Support Assistant position.  (Doc. 39) at 8, ¶ C.

Having decided not to hire Plaintiff for the Administrative Support Assistant position, Dr. Davis returned the unused Non-Competitive Candidate Referral List to Human Resources.  (Doc. 42-1) at 1, ¶ 5. VA Handbook 5005/64 states that "[a] selecting official has the right, which will not be negotiated, to select or non-select candidates from a properly constructed certificate.[5] This includes the right to non-select all of the candidates and return the certificate as unused." *Id.* at 2, ¶ 8.

In October 2017, the Veterans Health Administration re-advertised the Administrative Support Assistant vacancy under another job announcement and sought applicants from outside the NMVAHCS.  *Id.* at 1, ¶ 6.  "[I]t is not unusual for a hiring official … to decline selection when there is only one candidate and to request that the position be re-advertised to obtain a larger pool of applicants…."  *Id.* at 2, ¶ 8.  Plaintiff did not apply for the Administrative Support Assistant position under the re-advertised job announcement.  In November 2017, Defendant hired a non-NMVAHCS employee, Linda Rajnicek, a Caucasian, to fill the Administrative Support Assistant vacancy.  *Id.* at 1, ¶ 7; (Doc. 39-1) at 3.

Plaintiff testified at his deposition that he obtained clinical secretary experience when he worked in the "ENT" assisting in the podiatry clinic, the eye clinic, and the ear, nose, and throat clinic.  (Doc. 39-2) at 9, depo. at 47.  Plaintiff testified that he "knew how to go through the records and look up records for a patient…."  *Id.*  In addition, Plaintiff testified he knew how to assist lost patients and even escort them to their appointments.  *Id.*  Plaintiff noted that he would

---

[5] The Court understands that a "candidate referral list" encompasses the "certificate."  *See* (Doc. 42-1) at 1-2, ¶ 8.

also answer patients' questions when he worked in the eye and podiatry clinics. *Id.* at 10, depo. at 58. Furthermore, Plaintiff testified he expected to receive training if Defendant hired him for the Administrative Support Assistant job. *Id.* at 9, depo. at 57.

## II. The Complaint for Employment Discrimination and Retaliation (Doc. 1)

As noted above, Plaintiff is no longer pursuing certain claims. The remaining claims are as follows: (1) failure to hire Plaintiff as a File Clerk/Scanning Specialist based on Title VII race discrimination, ADEA age discrimination, and ADAA/Rehabilitation Act disability discrimination; (2) ) failure to hire Plaintiff as an Administrative Support Assistant based on Title VII race discrimination, ADEA age discrimination, and ADAA/Rehabilitation Act disability discrimination; and (3) retaliation based on the failure to hire Plaintiff as a File Clerk/Scanning Specialist. Defendant moves for summary judgment on those remaining claims.

## III. Summary Judgment Standard

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). A dispute over a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *Tabor v. Hilti, Inc.,* 703 F.3d 1206, 1215 (10th Cir. 2013).

## IV. Discussion

"To prevail on a Title VII discrimination claim, the plaintiff bears the ultimate burden of proving intentional discrimination by the employer." *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019). "When, as here, the plaintiff presents only circumstantial evidence of discrimination, [courts] analyze the claim under the *McDonnell Douglas* burden-shifting framework." *Id.* Under the *McDonell Douglas* framework, "the plaintiff has the initial burden of establishing a prima facie case of discrimination." *Id.* "If the plaintiff makes this [prima facie] showing, the burden shifts to the employer to assert 'a legitimate nondiscriminatory reason for its actions.'" *Id.* (citation omitted). "If the employer does so, 'the burden shifts back to the plaintiff to introduce evidence that the stated nondiscriminatory reason is merely a pretext.'" *Id.* (citation omitted). In addition to Title VII discrimination claims, courts apply the *McDonnell Douglas* burden-shifting framework to Title VII retaliation claims as well as to ADEA age discrimination and ADAA/Rehabilitation Act disability discrimination claims based on indirect evidence. *See id.* at 1042 (observing that *McDonnell Douglas* framework applies to Title VII retaliation claims); *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008) (applying *McDonnell Douglas* framework to ADEA age discrimination claims); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (applying *McDonnell Douglas* framework to ADA and Rehabilitation Act disability discrimination claims).

### A. Discrimination Claims Based on Defendant's Failure to Hire Plaintiff as an Administrative Support Assistant[6]

#### 1. Prima Facie Cases of Race, Age, and Disability Discrimination

For the purpose of this Motion for Summary Judgment, "Defendant concedes that Plaintiff can establish a *prima facie* case of discrimination based on race and age" with respect to

---

[6] The Court addresses the claims in the order the parties address them in their briefs.

the Administrative Support Assistant vacancy.  (Doc. 37) at 18.  Defendant, however, notes that

it is undisputed that Dr. Davis did not know Plaintiff suffered from PTSD when Dr. Davis did

not select Plaintiff for the Administrative Support Assistant position.  Defendant, therefore,

concludes that Dr. Davis' "decision could not have been discriminatory on the basis of

disability." *Id.* n. 6.  Plaintiff disputes that conclusion in the context of discussing the pretext

step of the *McDonnell Douglas* framework.  The Court assumes for the sake of argument that

Plaintiff also has established a *prima facie* case of disability discrimination and will focus on the

remaining steps of the *McDonnell Douglas* framework as they relate to all of the discrimination

claims associated with the Administrative Support Assistant vacancy.

### 2. *Legitimate Nondiscriminatory Reason for Not Hiring Plaintiff as an Administrative Support Assistant*

Dr. Davis attested that he did not hire Plaintiff for the Administrative Support Assistant

position because he "honestly believed" that Plaintiff "lacked the necessary experience/skills

needed for the position."  (Doc. 37-6) at 2, ¶ 6.  Plaintiff does not contest that Dr. Davis

proffered this legitimate nondiscriminatory reason for not hiring Plaintiff for the Administrative

Support Assistant position.  Instead, Plaintiff argues that the justification for not hiring Plaintiff

for that position is a pretext for discrimination.

### 3. *Pretext*

Generally, "[a] plaintiff may show pretext by demonstrating the proffered reason is

factually false, or that discrimination was a primary factor in the employer's decision."  *See*

*Payan v. United Parcel Serv.*, 792 Fed. Appx. 634, 645 (10th Cir. 2019) (citation omitted).

Often, a plaintiff accomplishes this by "demonstrating such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action[s] that a reasonable factfinder could rationally find them unworthy of credence and

hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id*. (citation omitted).  However, "[m]ere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment." *Id.* (citation omitted).

To assess pretext, courts "consider the evidence of pretext in its totality." *Id*. (citation omitted).  Courts "examine the facts as they appear to the person making the decision and do not look to the plaintiff's subjective evaluation of the situation." *Id.* (citation omitted). "Instead of asking whether the employer's reasons were 'wise, fair[,] or correct,' the relevant inquiry is whether the employer 'honestly believed those reasons and acted in good faith upon those beliefs.'" *Id.* (citations omitted).  In other words, "[t]o support an inference of pretext, to suggest that something more nefarious might be at play, a plaintiff must produce evidence that the employer did more than get it wrong." *Johnson v. Weld Cty., Colo*., 594 F.3d 1202, 1211 (10th Cir. 2010).  The plaintiff "must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda." *Id.*

Plaintiff provides several reasons which he argues create a question of fact as to whether Dr. Davis' decision not to hire him as an Administrative Support Assistant was pretexual. Plaintiff notes first that he was the only person to apply for the position and that he was deemed qualified by virtue of being placed on the Non-Competitive Candidate Referral List.  Plaintiff, however, does not explain how being the lone applicant who meets general minimum qualifications for the position repudiates Dr. Davis' purported honest belief that Plaintiff did not have the necessary experience and skills for the Administrative Support Assistant position, a position that requires certain experience and skills tailored to meet the specific needs of the Neurology Service.  Plaintiff does not dispute that his clinical secretary experience was not in a

neurology unit or department.  In fact, the VA Handbook allows for the non-selection of all

minimally qualified applicants on a Candidate Referral List and the return of the unused

Candidate Referral List, which Dr. Davis did in this case.  Moreover, it is undisputed that it is not

unusual to re-advertise a position to obtain a larger pool of qualified candidates.  Even viewing

the above evidence in the light most favorable to Plaintiff, a reasonable jury could not find Dr.

Davis' non-selection of Plaintiff was somehow "nefarious" and indicative of a "hidden

discriminatory agenda."  *See Johnson*, 594 F.3d at 1211.

Second, Plaintiff argues that he had prior clinical secretary experience when he worked in

the ENT assisting the podiatry clinic, the eye clinic, and the ear, nose, and throat clinic.  That

experience included going through medical records, assisting lost patients, and answering

patients' questions.  However, as stated above, it is undisputed that this clinical secretary

experience was not in a neurology unit or department, which have specific needs associated with

the provision of neurological care.  In addition, Plaintiff's subjective view of his own

qualifications is not relevant to the question of pretext and, thus, cannot create a material issue of

fact to defeat summary judgment.  *See Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318

(10th Cir. 1999), *overruled on other grounds by National R.R. Passenger Corp. v. Morgan,* 536

U.S. 101 (2002) (finding that plaintiff's "own opinions about her qualifications do not give rise

to a material fact dispute").

Even if the Court assumes that Dr. Davis "misjudged [Plaintiff's] qualifications, such

evidence would not preclude summary judgment in this case."  *Id.*  "The relevant inquiry is not

whether [Dr. Davis'] proffered reasons were wise, fair or correct, but whether [Dr. Davis]

honestly believed those reasons and acted in good faith upon those beliefs."  *Id.* (citing, e.g.,

*Sanchez v. Philip Morris Inc.,* 992 F.2d 244, 247 (10th Cir. 1993) ("Title VII is not violated by

the exercise of erroneous or even illogical business judgment.")).  Plaintiff presents no evidence

showing that Dr. Davis did not honestly believe that Plaintiff lacked the skills to carry out the

specialized work required by an Administrative Support Assistant in the Neurology Service, with

or without training, or that Dr. Davis failed to act in good faith upon his beliefs.  *See id.*

(discerning "no showing of pretext" when plaintiff "presents no evidence indicating [the

employer] did not believe the interviewers' assessment of her qualifications, and … review of

the record reveals no evidence that [the employer] failed to act in good faith in reliance on those

assessments"); *Wiemer v. Learjet Inc.*, 113 Fed. Appx. 887, 889–90 (10th Cir. 2004) (holding

that "[e]ven if [the employer's] assessment of plaintiff's abilities was incorrect, this does not

show pretext unless there is reason to believe the employer failed to exercise its business

judgment in good faith").

Indeed, the following uncontested facts:  Dr. King's honest belief "that [Plaintiff's]

previous work experience and skill set did not match the needs of the Service;" the interview

team's unanimous agreement that Plaintiff "lacked the skills needed for the position;" and the

interview team's lack of enthusiasm about Plaintiff's interview, corroborate and support Dr.

Davis' legitimate nondiscriminatory reason for not offering Plaintiff the Administrative Support

Assistant position, that Plaintiff "lacked the necessary experience/skills needed for the

position…."  (Doc. 37-7) at 1-2, ¶ 5; (Doc. 37-6) at 1 and 2, ¶¶ 5-6.

Third, Plaintiff argues that Dr. Davis' question about how long he intended to work

considering he is near retirement age and Dr. Davis' subsequent comment that Plaintiff was

"going to be like Walter" indicate pretext for race and age discrimination.  To begin with, the

Tenth Circuit has held that a single question about retirement plans does not provide evidence of

pretext in the context of age discrimination.  *See Kirkpatrick v. Pfizer, Inc.*, 391 Fed. Appx. 712,

719–20 (10th Cir. 2010) (determining that supervisor's comment regarding retirement plans does not support age bias or pretext); *see also Ziegler v. Beverly Enters.-Minn., Inc.,* 133 F.3d 671, 676 n. 3 (8th Cir. 1998) (holding employer's questions about employee's age and retirement plans not sufficient to demonstrate age discrimination); *Woythal v. Tex–Tenn Corp.,* 112 F.3d 243, 247 (6th Cir. 1997) (same); *Colosi v. Electri–Flex Co.,* 965 F.2d 500, 502 (7th Cir. 1992) (observing that "company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct").

Moreover, Plaintiff does not explain how the comment about being "like Walter," an African American working into his seventies, provides evidence of pretext for either race or age discrimination.  (Doc. 39-2) at 5, depo. at 33.  If anything, contrary to Plaintiff's allegations of race and age discrimination, Walter's situation actually shows that Defendant employs older African Americans.  *See Swackhammer v. Sprint/United Mgmt. Co.,* 493 F.3d 1160, 1169 (10th Cir. 2007) (noting that Tenth Circuit has "held that when a plaintiff's evidence supports a nondiscriminatory motive for the employer's action and the plaintiff presents no evidence to undermine that motive, summary judgment for the employer is appropriate").  Plaintiff's reliance on the comment regarding Walter to demonstrate pretext simply amounts to "mere speculation, conjecture, or surmise," which cannot "defeat a motion for summary judgment…." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

Fourth, Plaintiff notes that Defendant hired Rajnicek, a Caucasian, to fill the Administrative Support Assistant position under the re-advertised job announcement.[7]  Rajnicek, however, did not compete with Plaintiff with respect to the job announcement he applied for.

---

[7] Plaintiff also claims that Rajnicek was middle-aged, citing (Doc. 39-1) at 3.  That citation, however, simply states that Dr. King did not know Rajnicek's age.  *Id.*

Significantly, Plaintiff has not presented evidence that he applied for, or otherwise pursued, the Administrative Support Assistant position under the re-advertised job announcement. *See Bennett v. Quark, Inc.,* 258 F.3d 1220, 1228 (10th Cir. 2001), *overruled on other grounds as explained in Boyer v. Cordant Techs., Inc.,* 316 F.3d 1137, 1140 (10th Cir.2003) (holding that plaintiff must show she applied for, or at least sought, position at issue to make *prima facie* case of discrimination for failure to hire). Moreover, Plaintiff has not presented evidence that he administratively exhausted any discrimination claim premised on Rajnicek's selection. *See Hickey v. Brennan*, 969 F.3d 1113, 1118 (10th Cir. 2020) (holding that "[f]ederal employees alleging discrimination or retaliation prohibited by Title VII or the Rehabilitation Act must comply with specific administrative complaint procedures in order to exhaust their administrative remedies" and "court must enforce this exhaustion requirement if the employer properly raises it"). Rajnicek's selection for the Administrative Support Assistant position, therefore, cannot support Plaintiff's assertion of pretext as a matter of law.

Fifth, Plaintiff observes that "Defendant failed to produce the application packet for the selected candidate," Rajnicek. (Doc. 39) at 11. As noted above, Rajnicek applied for a job announcement not at issue here and, thus, her application packet is not relevant to Plaintiff's pretext argument.

Finally, Plaintiff contends that Dr. Davis' attestation that he did not know about Plaintiff's disability is false. Although Defendant did not produce Plaintiff's application for the Administrative Support Assistant position, "Plaintiff always includes his service-connected disability rating on his resume." *Id.* Consequently, Dr. Davis' review of Plaintiff's resume would have revealed that Plaintiff has a service-connected disability. Defendant, on the other

hand, argues that Dr. Davis' knowledge of Plaintiff's disability is only relevant to a *prima facie* case of disability discrimination, not to the issue of pretext.

As stated above, the Court assumes that Plaintiff established a *prima facie* case of disability discrimination, which includes establishing that Plaintiff "was discriminated against because of his disability," a *prima facie* case element that implies knowledge of the disability. *See Turner v. Phillips 66 Co.,* 791 Fed. Appx. 699, 710 (10th Cir. 2019) (citations omitted) (setting forth elements for *prima facie* case of disability discrimination). At the pretext step of the *McDonnell Douglas* framework, "the presumption of discrimination created by the plaintiff's prima facie case 'simply drops out of the picture.'" *Swackhammer*, 493 F.3d at 1167 (citation omitted). Hence, "a pretext argument … allow[s] the factfinder 'to infer the ultimate fact of discrimination from the falsity of the employer's explanation.'" *Id.* (citation omitted). "However, it is not *always* permissible for the factfinder to infer discrimination from evidence that the employer's explanation is unworthy of belief." *Id.* at 1168. For example, if "'only a weak issue of fact [exists] as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred,' the fact that the employer's explanation was unworthy of belief would no longer be sufficient to create an inference of discrimination." *Id.* "[T]he falsity of an employer's proffered explanation … defeats summary judgment only if it could reasonably lead the trier of fact to infer a discriminatory motive…." *Id.*

Certainly, a factual issue exists as to whether Dr. Davis knew about Plaintiff's service-connected disability at the time he decided not to hire Plaintiff as an Administrative Support Assistant. The Court agrees with Defendant that this factual dispute regarding Dr. Davis' knowledge of Plaintiff's disability concerns Plaintiff's *prima facie* case of disability

16

discrimination, i.e., that Dr. Davis discriminated against Plaintiff because of his disability.
Given that the Court assumes for the sake of argument that Plaintiff met his burden to
demonstrate a *prima facie* case of disability discrimination, the issue of whether Dr. Davis knew
about Plaintiff's disability "drops out" of the pretext analysis.  Plaintiff, in fact, does not explain
how Dr. Davis' apparently false statement about his knowledge of Plaintiff's disability shows the
falsity of Dr. Davis' reason for not hiring Plaintiff, Plaintiff's lack of necessary experience or
skills.  Put another way, Plaintiff fails to show how Dr. Davis' apparently false statement about
his knowledge of Plaintiff's disability constitutes evidence from which a reasonable jury could
infer that Dr. Davis acted with a discriminatory motive when the uncontroverted evidence by Dr.
King and the interview team corroborate Dr. Davis' legitimate nondiscriminatory reason for not
hiring Plaintiff as an Administrative Support Assistant.  Plaintiff's factual issue is simply not
material to the question of pretext.

        In sum, Plaintiff's pretext arguments, even if viewed in their totality, rely on mere
conjecture.  As a result, Plaintiff has failed to demonstrate a genuine issue of material fact that
Dr. Davis did not honestly believe in his proffered legitimate nondiscriminatory reason for
failing to hire Plaintiff as an Administrative Support Assistant or that Dr. Davis did not act in
good faith upon that belief.  Consequently, Plaintiff has not shown that Dr. Davis' proffered
legitimate nondiscriminatory reason for failing to hire Plaintiff was pretextual.  The Court, thus,
concludes that Plaintiff's race, age, and disability discrimination claims regarding the
Administrative Support Assistant vacancy fail as a matter of law under the *McDonnell Douglas*
framework.  Accordingly, Defendant is entitled to summary judgment on those discrimination
claims.

*B.   Discrimination Claims Based on Defendant's Failure to Hire Plaintiff as a File Clerk/Scanning Specialist*

To defeat summary judgment on Plaintiff's race, age, and disability discrimination claims based on Defendant's failure to hire Plaintiff as a File Clerk/Scanning Specialist, Plaintiff must first show under the *McDonnell Douglas* framework a *prima facie* case of discrimination.  "[A] prima facie case of discrimination must consist of evidence that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).  Defendant argues that Plaintiff cannot establish a *prima facie* case of discrimination with respect to its failure to hire Plaintiff as a File Clerk/Scanning Specialist because Plaintiff did not suffer an adverse employment action, the second element of a *prima facie* case of discrimination.  Specifically, Defendant contends that hiring Plaintiff as a File Clerk/Scanning Specialist would have placed Plaintiff in a lower grade and paying position, a situation that cannot create an adverse employment action as a matter of law.

Plaintiff, however, argues that the failure to select him for a File Clerk/Scanning Specialist position creates an adverse employment action for three reasons.  First, Plaintiff argues that he "applied for the position to get out of his department where he had filed an EEO complaint against his supervisor," presumably, to move to a department Plaintiff felt was more agreeable or congenial.  (Doc. 39) at 12.  Second, Plaintiff asserts that he "wanted to go into the file clerk position because he believed there is upward mobility."  *Id.*  Finally, Plaintiff argues that a failure to hire is in itself an adverse employment action.

"The Tenth Circuit liberally defines the phrase 'adverse employment action.'"  *Sanchez v. Den. Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998) (citations omitted).  "Such actions are not

simply limited to monetary losses in the form of wages or benefits." *Id.* Rather, the Tenth

Circuit "take[s] 'a case-by-case approach,' examining the unique factors relevant to the situation

at hand." *Id.* (citation omitted). Adverse employment actions include "a significant change in

employment status, such as hiring…." *Id.* (citation omitted).

Although a failure to hire generally constitutes an adverse employment action, as Plaintiff

contends, the Tenth Circuit and other courts have held that in certain situations a failure to hire

does not create an adverse employment action. For instance, in *Tapia v. City of Albuquerque*, a

case similar to this one, the Tenth Circuit held that the failure to transfer an employee did not

create an adverse employment action because the desired position was a demotion. *Tapia*, 170

Fed. Appx. 529, 535 (10th Cir. 2006); *see also Williams v. R.H. Donnelley Corp.*, 368 F.3d 123,

128 (2d Cir. 2004) (noting that "[c]learly, an employer's denial of a transfer request that would

have resulted in a reduction in pay and the employee's demotion within the organization, without

more, does not constitute an adverse employment action"); *Cuenca v. Univ. of Kansas*, 265 F.

Supp. 2d 1191, 1210 (D. Kan. 2003), *aff'd,* 101 Fed. Appx. 782 (10th Cir. 2004) (concluding that

"failure to demote claim … is not actionable under Title VII").

Even in the context of a denial of an employee's request for a lateral transfer, the Tenth

Circuit has held that such a denial does not constitute an adverse employment action. *Sanchez*,

164 F.3d at 532 (holding that failure to receive "purely lateral" transfer was not adverse

employment action). Importantly, "the fact that the employee views the [lateral] transfer either

positively or negatively does not of itself render the denial or receipt of the transfer adverse

employment action." *Id.* at 532 n. 6; *see also Momah v. Dominguez*, 239 Fed. Appx. 114, 123

(6th Cir. 2007) (noting that Seventh Circuit "previously held that an 'employee's subjective

impressions as to the desirability of one position over another are not relevant' in determining whether the employee suffered an adverse employment action") (citation omitted).

With respect to whether harm to future employment prospects can constitute an adverse employment action, the Tenth Circuit has held that

> an act by an employer that does more than *de minimis* harm … to a plaintiff's future employment *prospects* can, when fully considering "the unique factors relevant to the situation at hand," be regarded as an "adverse employment action," even where plaintiff does not show the act precluded a particular employment prospect….

*Hillig v. Rumsfeld*, 381 F.3d 1028, 1033 (10th Cir. 2004) (citation omitted).

Here, no reasonable jury viewing the evidence in the light most favorable to Plaintiff could find that the File Clerk/Scanning Specialist position was anything but a demotion. The above precedent clearly precludes, as a matter of law, a determination that Defendant's failure to hire Plaintiff for that lesser position amounted to an adverse employment action. Also, Plaintiff's subjective belief that a move to a different department would be more agreeable than his present department is irrelevant to whether Defendant's failure to hire Plaintiff as a File Clerk/Scanning Specialist constitutes an adverse employment action.

Finally, although harm to a plaintiff's future employment prospects can create an adverse employment action, Plaintiff has not presented any evidence to support his claim that he would "have upward mobility" if he held a File Clerk/Scanning Specialist job in a different department, especially considering that the promotion potential of a File Clerk/Scanning Specialist is a GS-4, step 10, with an annual salary of $38,258, well below Plaintiff's current annual salary of $42,814. *See* (Doc. 37-2) at 14. Moreover, Plaintiff merely speculates that if he goes to another department as a File Clerk/Scanning Specialist he could obtain a different position that would provide a better salary than he now receives as a Supply Technician. Plaintiff does not provide any examples of such possible positions. Given the lack of evidence to support even a

possibility of upward mobility in another department, no reasonable jury could find, even

viewing the evidence in the light most favorable to Plaintiff, that failing to hire Plaintiff as a File

Clerk/Scanning Specialist amounted to more than a *de minimis* harm to Plaintiff's prospect for

"upward mobility." Plaintiff's "[s]peculative harm does not constitute adverse employment

action." *Aquilino v. Univ. of Kansas*, 268 F.3d 930, 936 (10th Cir. 2001) (holding that denying

plaintiff "ad hoc membership on the graduate faculty" did not "constitute[] an adverse

employment action because it harmed her future employment prospects" where harm was

speculative). Accordingly, Plaintiff's "[u]nsupported conclusory allegations" regarding the

opportunity for upward mobility "do not create an issue of fact." *Couture v. Belle Bonfils Mem'l*

*Blood Ctr.*, 151 Fed. Appx. 685, 690 (10th Cir. 2005) (citation omitted) (concluding that plaintiff

"has not alleged with any specificity the degree to which he would be entitled to … extra pay"

had he been hired as donor technician). Plaintiff's argument that he suffered an adverse

employment action because Defendant's failure to hire him as a File Clerk/Scanning Specialist

would harm his future employment prospects, likewise, fails as a matter of law.

To summarize, Plaintiff has failed to present evidence from which a reasonably jury

could conclude that Plaintiff has established a *prima facie* case of race, age, and disability

discrimination based on Defendant's failure to hire him as a File Clerk/Scanning Specialist.

Consequently, Defendant is entitled to summary judgment on those discrimination claims. Given

that determination, the Court need not address the remaining *McDonnell Douglas* steps as they

relate to Defendant's failure to hire Plaintiff as a File Clerk/Scanning Specialist. *See Flaherty v.*

*Entergy Nuclear Operations, Inc.*, 946 F.3d 41, 55 (1st Cir. 2019) (finding that since plaintiff

"failed to establish a prima facie case of disability discrimination … it [is] unnecessary to

address the remaining stages of the McDonnell Douglas burden-shifting framework").

*C. Retaliation Claim Based on Defendant's Failure to Hire Plaintiff as a File Clerk/Scanning Specialist Position*

To preclude summary judgment on the retaliation claim based on Defendant's failure to hire Plaintiff as a File Clerk/Scanning Specialist, Plaintiff first must demonstrate under the *McConnell Douglas* framework a *prima facie* case of retaliation. "To establish a prima facie case of retaliation under Title VII, the plaintiff must show (1) engagement in activity protected under Title VII; (2) a materially adverse employment action; and (3) a causal connection between the protected activity and the materially adverse action." *Robinson v. Barrett*, 823 Fed. Appx. 606, 610 (10th Cir. 2020).

Defendant argues that Plaintiff has not produced evidence that he meets the causal connection element of a *prima facie* case of retaliation. First, Defendant asserts that Plaintiff cannot demonstrate causation because neither Wirth nor Foster knew about Plaintiff's previous EEO activity. Second, Defendant asserts that a nine-month gap between Plaintiff's last EEO activity in 2016 and Defendant's 2017 decision not to hire Plaintiff as a File Clerk/Scanning Specialist, also, does not demonstrate causation.[8]

The Tenth Circuit has held that "[a]n employer's action against an employee cannot be *because* of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition." *Petersen v. Utah Dep't of Corr.,* 301 F.3d 1182, 1188 (10th Cir. 2002). Namely, a "plaintiff must show that the individual who took adverse action against him knew of the employee's protected activity." *Id.* at 1188-89 (citation omitted).

In this case, both Wirth and Foster attested that they did now about Plaintiff's EEO activity when Wirth declined to recommend Plaintiff for a File Clerk/Scanning Specialist

---

[8] Plaintiff does not contest Defendant's assertion that the time between Plaintiff's last EEO activity and Defendant's decision not to hire Plaintiff as a File Clerk/Scanning Specialist was nine months.

position.  Nonetheless, Plaintiff notes that Wirth stated during Plaintiff's interview that she would speak with his supervisor, who was the subject of previous EEO complaints filed by Plaintiff.  Plaintiff alleges that one can infer from that evidence alone that Wirth must have spoken with his supervisor and the supervisor told Wirth about the EEO complaints.  Such "[u]nsupported conclusory allegations" grounded on "mere speculation," however, simply do not create a genuine issue of material fact sufficient to defeat summary judgment.  *See Couture*, 151 Fed. Appx. at 690; *Bones*, 366 F.3d at 875.

Even so, a plaintiff can establish a causal connection with evidence of "protected conduct closely followed by adverse action." *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007).  However, "unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

In this instance, a nine-month period between Plaintiff's last EEO activity and Defendant's decision not to hire Plaintiff as a File Clerk/Scanning Specialist does not by itself establish causation as a matter of law.  *See id.* (citation omitted) (observing that Tenth Circuit has "held that a three-month period, standing alone, is insufficient to establish causation").  Beyond temporal proximity, Plaintiff merely asserts that his resume score was very high but his final rating was "significantly lower than the selected candidates after Defendant stated it would need to talk to Plaintiff's supervisor."  (Doc. 39) at 15.  As stated above, Plaintiff's conclusory and speculative supposition that Wirth must have actually spoken with Plaintiff's supervisor and that the supervisor told Wirth about the EEO complaints does not create a genuine question of material fact.

For the foregoing reasons, a reasonable jury viewing the evidence in the light most favorable to Plaintiff could not find a causal connection between Plaintiff's EEO activity and Defendant's failure to hire Plaintiff as a File Clerk/Scanning Specialist.  Plaintiff, therefore, has not carried his burden of demonstrating a *prima facie* case of retaliation based on that failure to hire.  Accordingly, Defendant is entitled to summary judgment on this retaliation claim.  Given this determination, the Court finds it unnecessary to address the other *McDonnell Douglas* steps related to this last remaining retaliation claim.  *See Flaherty*, 946 F.3d at 55.

IT IS ORDERED that

1.  the Motion for Summary Judgment and Supporting Memorandum (Doc. 37) is granted;

2. summary judgment will be entered in Defendant's favor on all of Plaintiff's claims; and

3.  those claims will be dismissed with prejudice, thereby terminating this lawsuit.

_____

UNITED STATES DISTRICT JUDGE